PATRICK McWEENEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McWeeney v. Commissioner
Docket No. 5910-74.
United States Tax Court
T.C. Memo 1977-428; 1977 Tax Ct. Memo LEXIS 11; 36 T.C.M. (CCH) 1749; T.C.M. (RIA) 770428; December 22, 1977, Filed Kenneth Gluck and Irving Tobin, for the petitioner. Marwin A. Batt, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax under section 6653(b), I.R.C. 1954, [1] for the years and in the amounts as follows: Deficiencies
Additions to Tax Tax Year Ended
I.R.C. 1954 December 31
Income Tax
Section 6653(b)
1965
$ 2,675.07
$1,337.54
1966
15,979.19
7,989.60
1967
5,803.59
2,901.80
1968
19,772.17
9,886.09
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision *12 the following: (1) The proper amount of petitioner's income from a tavern which he operated as a sole proprietorship in each of the years here in issue; and (2) whether any part of the underpayment in tax by petitioner for any of the years here in issue was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Patrick W. McWeeney (hereinafter referred to as petitioner) is an individual who resided in Elizabeth, New Jersey at the time of the filing of the petition in this case. Petitioner filed individual income tax returns for each of the years here in issue. Petitioner was born in Ireland on May 9, 1901.He lived in Ireland for approximately 23 years and then came to this country. Petitioner was the second oldest of 7 children. When he was approximately 6 years old, he began attending school and when he was not in school he would help with the farm work. In the first year or two he attended school 6 or 8 months a year and helped with the farm work the balance of the year. As he got older he would attend school for 3 or 4 months a year and work on the farm the remaining part of the year. Although he attended school periodically *13 until he was in his teens, when he began to work full time on the farm, the school term he completed was the equivalent of approximately a fourth grade education in this country. When petitioner was 23 years old he came first to New York and then went to Burlington, Vermont, where he worked on a farm. Petitioner worked as a farm laborer for around 2 years and then moved to New Jersey, where he obtained a laborer's job. He worked as a laborer in the Elizabeth, New Jersey area from approximately 1926 through 1933, except that in 1930 through 1932 he was out of work quite a bit. Petitioner lived very frugally both when working as a farm hand and as a laborer and saved much of what he earned. When he initially came to New Jersey he lived in the home of his aunt and paid a modest sum to her for room and board. Later he lived in the home of his sister, although from time-to-time he would live in a rented, furnished room. When prohibition ended, petitioner decided to go into the tavern business. With some of his savings he purchased a tavern license for operation of a tavern at 548 Edgar Road in Elizabeth, New Jersey.Petitioner operated this tavern under the name of "Paddy's Tavern" *14 continuously from 1934 until 1975 when he sold the business. During this time, including the entire period 1965 through 1968, petitioner engaged in the tavern business as a sole proprietorship. Petitioner has never been married. He has always lived frugally. He does not own an automobile and any vacation he takes consists primarily of going fishing with friends somewhere along the coast of New Jersey. In 1937 petitioner took some of his savings and purchased stocks through two brokers. He left the stocks with the brokerage companies. Thereafter he invested any dividends accumulated in his brokerage accounts in stock, and he bought and sold stock through these two accounts, but never after 1937 did he add any funds, other than those generated through the accounts, to his brokerage accounts. One of petitioner's accounts was with F. P. Ristine and Co., which merged into McDonnell and Co. in 1966. The other account was with Eisele King Co., which company was taken over by Harris Upham and Co., Inc. where petitioner continued his account. In 1957 petitioner began buying stock on margin. However, he continued his practice of never withdrawing any cash from his brokerage accounts, *15 and this practice continued through the years here in issue. Beginning in approximately 1960, petitioner had his Federal income tax returns prepared by a man named Ed Strauss who operated as a tax preparer under the name Strauss Tax Services. Petitioner's returns for the years 1965, 1966 and 1967 were prepared by Mr. Strauss from information which petitioner furnished to Mr. Strauss. Included in the information furnished by petitioner to Mr. Strauss were his monthly brokerage statements. On his returns for 1965, 1966 and 1967 the following items were reported as dividends and as interest expense in connection with petitioner's brokerage accounts: Dividends
Interest Year
Payor
Reported
Deducted
1965
"F. P. Ristine Co."
$16,042.83
$ 6,881.95
"Eisele & King"
2,276.44
2,005.87
Total
$18,319.27
$ 8,887.82
1966
"F. P. Ristine Co."
$18,585.64
$18,585.64
"Harris Upham Co."
2,067.10
2,273.47
Total
$21,652.74 *
$20,859.11
1967
"McDonnell & Co."
$18,921.60
$16,840.00
"Harris Upham Co."
2,027.17
2,115.25
Total
$20,948.77
$18,955.25
No sales of stock *16 or capital gains or losses from stock transactions were reported on petitioner's income tax returns for the years 1965, 1966 and 1967. Mr. Strauss died some time in 1968. In the spring of 1969 petitioner engaged Mr. Peter V. Rotolo to prepare his 1968 income tax return. On this return no dividend income was reported and no interest on margin accounts was deducted. However, on the 1968 return a capital gain was reported, computed by showing a sale of "Various Stock" acquired in 1962 and sold in 1968. The selling price shown was $19,621.03, and the basis shown was $19,506.70. In each of the years 1965 through 1967 dividend income was correctly reported on petitioner's tax returns. In the year 1965 the interest deduction was correctly reported. However, for 1966 petitioner failed to claim $201.67 of deductible interest, and for 1967 the interest deduction on petitioner's margin account with McDonnell and Co. was $15,966.27 instead of the $16,840 claimed by petitioner. The amount of interest income reported by petitioner from savings accounts was correctly reported in each of the years here in issue. Petitioner made no withdrawals from any of these savings accounts during the *17 years here in issue. During the years 1965 through 1968, sales were made of various stocks through petitioner's brokerage accounts. Some of these sales were made when a margin account was sufficiently low to require that the stock be sold. Petitioner's stocks were all held in street names, and petitioner never received any stock certificates. He would receive certain brokerage company letters in the envelope with his monthly statements, but rarely looked at them. Usually, he did look at the stock reports in the Newark, New Jersey Sunday paper. Based on these reports, he would sometime call his brokers and discuss whether he should sell one stock and buy another. Petitioner received confirmation of all sales he made in each year. The monthly statements he received from the brokerage houses showed his purchases and sales as well as dividends received and interest paid. Each of these statements bore a notation to the effect that it was an important paper and should be retained for use in computing income tax. Petitioner had net unreported capital gains after the section 1202 deduction in the years here in issue in the following amounts: Year
Net Gain
1965
$ 633.04
1966
27,238.90
1967
6,043.75
1968
29,046.81
*18 Petitioner had unreported dividend income in 1968 of $21,246.18 and failed to claim deductible interest paid on his brokerage margin accounts in the year 1968 in the amount of $21,947.98 Petitioner understood little about the income tax laws and relied on the preparer of his returns to properly report his income. Although he furnished his monthly brokerage statements to Mr. Strauss, he never mentioned to Mr. Strauss the fact that he had sales of stock during the years 1965 through 1967, and Mr. Strauss never asked him about such sales. Petitioner believed that he had not received income from a sale of stock or sustained a loss on a sale of stock unless he took the money out of his brokerage accounts. Petitioner does not know why Mr. Rotolo did not include his dividend income on his 1968 income tax return or deduct the interest he paid on his margin accounts on that return. He does not know how the figures used on his 1968 return for sales of stock were arrived at. He gave Mr. Rotolo the statements which Mr. Rotolo asked him for and he assumed Mr. Rotolo had properly computed his income from these statements. At the time of the trial of this case Mr. Rotolo was approximately *19 82 years old and in bad health. Most of the houses in the area in which petitioner's tavern was located were in existence when petitioner moved to the area in 1926. During the years here in issue most of these houses were occupied by people who were laborers. Petitioner's tavern was patronized primarily by people who lived in the neighborhood. Most of petitioner's customers would buy "a shot and a beer." A "shot" consisted of one ounce of whiskey. During the time petitioner operated the tavern he used beer glasses of various sizes, but during the years here in issue petitioner was using 8-ounce glasses. From the time petitioner opened the tavern through the years here in issue he sold "a shot and a beer" at varying prices ranging from 35 cents to 50 cents. If a "shot" was sold separately from a beer it would be sold from prices which ranged over these years from 30 cents to 45 cents, and a beer sold separately from 10 to 15 cents. The beer petitioner sold in his tavern was generally draft beer and there would be some wastage in filling the glasses. Petitioner, in addition to selling drinks for consumption on his premises, also sold some packaged goods. The beer he sold as *20 packaged goods was either bottled or canned beer and the whiskey and wine sold as packaged goods were bottled. Petitioner's profit on packaged goods was less than on drinks sold in the tavern. In January 1969, petitioner's Federal income tax return for the year 1966 was assigned to an Internal Revenue agent for investigation. The agent got in touch with petitioner and was referred to a Mr. Russo as a representative of petitioner. Some time around the first to the middle of March 1969 the agent had a conference with petitioner's representative, Mr. Russo. Thereafter the agent had a number of conferences with Mr. Russo and petitioner himself appeared at several of these conferences. The agent asked petitioner and Mr. Russo for the books and records of the tavern and for petitioner's brokerage statements and sale confirmation slips. The agent was told that whatever of these records petitioner had would be furnished, but petitioner was not sure where the records were.Eventually some of the monthly brokerage statements were furnished to the agent, but the statements furnished were so incomplete that the agent went to the two brokerage companies and got the complete records from *21 which to compute the amount of petitioner's income from his stock transactions. The agent asked petitioner if he had any stock transactions during the years here in issue, and petitioner told him "I took no money out, and therefore I had no transactions." The agent went by Mr. Strauss's home and asked Mr. Strauss's widow for Mr. Strauss's files with respect to petitioner's tax returns. The widow found an envelope marked with petitioner's name, but all this envelope contained was one sheet of paper for the year 1966 with a notation on it "Revised." The agent found the tavern records for the years here in issue to be incomplete and inaccurate. He therefore obtained the reports which petitioner had filed with the Department of the Treasury of the State of New Jersey reporting sales of beer, liquors and wines. The agent determined the gallonage of the various items sold by petitioner from these reports.The agent computed beer sales by allowing a 15 percent wastage and using 10 cents a glass for a 7-ounce glass of beer in 1965 and 1966, and 15 cents for a 7-ounce glass of beer in 1967 and 1968. During all of the years the agent used 45 cents as the sales price of one ounce of whiskey. *22 The agent made no adjustment for petitioner's packaged sales. In this manner the agent computed petitioner's gross receipts from his tavern business and deducted the expenses as reported by petitioner on his returns. In September 1965 petitioner entered a hospital in Elizabeth, New Jersey for a hernia operation.Complications developed from this operation and petitioner was in the hospital for a total of 5 weeks in 1965 and was recouperating at his sister's home for a number of weeks thereafter. Petitioner went back to work in the tavern toward the end of the year. During the early part of the following year the area where the hernia operation had been performed ruptured and petitioner was hospitalized again in 1966 and was away from the tavern for a number of months. Petitioner continued to have problems resulting from the hernia operation in 1967 and 1968 and was away from his work in the tavern for a number of weeks during each of these years. When petitioner was away from the tavern, he either got a relative or hired a friend to run the tavern. When he returned to the tavern he would discover that the receipts were not what they should have been for the amount of beer *23 and whiskey which had been sold. On the basis of whiskey disposed of and receipts from sales, there had been more wastage of beer and whiskey when petitioner was not operating the tavern himself than during the time he operated it. Petitioner had a brother who lived in Connecticut who was, from time-to-time, in an institution for the retarded. During the years here in issue petitioner would occasionally go to Connecticut to visit his brother and he would occasionally give or send his brother small amounts of money. During the years here in issue petitioner's living expenses, including small amounts given to his brother, ranged around $2,000 a year. Petitioner drew no money out of his savings or his brokerage accounts, but paid his living expenses out of receipts from the tavern. Petitioner did not have an automobile during any of the years here in issue and on his occasional fishing trips to the New Jersey coast would either go by bus or ride with a friend. During the years here in issue petitioner's tavern was generally open 5 days a week. The tavern would generally be closed on either Monday or Tuesday and when it was operated on Sunday would not be open until around *24 twelve noon.Generally on the other days the tavern operated from 8 o'clock in the morning until approximately midnight, except that during the years here in issue, because of his health problems, petitioner very often closed the tavern early.
On petitioner's tax returns as filed he reported taxable income for the years 1965 through 1968 in the amounts of $9,444.94, $2,300.71, $2,611.16, and $3,271.42, respectively. Respondent in his notice of deficiency increased petitioner's taxable income as reported by the following amounts in each of the years here in issue: 1965
1966
1967
1968
Additional receipts
$5,733.80
$ 9,216.43
$8,654.30
$12,382.96
Dividends received
0
0
0
21,246.18
Capital transactions
633.04
27,545.90
6,043.75
29,353.81
Respondent allowed the interest expense deduction which petitioner had not claimed for 1968 and also made certain other minor adjustments not here in issue. The additional receipts from the tavern as set forth in the notice of deficiency were made on the basis of the computation as made by respondent's revenue agent. OPINION The issues here are purely factual. The burden of proof is on petitioner to *25 show error in respondent's determination of his income from the tavern, and respondent has the burden to show fraud by clear and convincing evidence. Petitioner at the trial made several contradictory statements with respect to the prices at which his drinks were sold and the size of the glasses used.The testimony is very confusing as to prices. However, we have concluded that at no time during the years here in issue did petitioner sell "a shot and a beer" for in excess of 50 cents. The difficulty is that though petitioner generally sold "a shot and a beer" in combination he would at times sell a beer and a shot separately, and, as we have found from the record, during most, if not all, of the years here in issue under these circumstances the beer would be sold for 10 or 15 cents a glass and the shot at 40 or 45 cents. The record does not show precisely the proportion of petitioner's sales which consisted of "a shot and a beer" and the proportion which consisted of separate sales of beers and shots. From the record we have determined that during the entire period here involved petitioner sold beer in 8-ounce glasses. However, the record shows that in many instances not over *26 7 ounces of beer would go into an 8-ounce glass but in other instances the glass would be filled to the brim. While the record shows that generally there was 15 percent wastage in keg beer sales, during some of the time involved in this case when petitioner was away from his tavern and left the operation to others the wastage would be in excess of 15 percent. The record here also is clear that petitioner did make certain packaged sales at a profit substantially less than sales by the drink. Petitioner's testimony on the percentage of sales that were packaged sales is not precise. At one point he stated that perhaps 20 percent of his sales were packaged beer and whiskey, and at another point stated he could not accurately estimate the percentage of the sales which were packaged sales. At the trial petitioner offered as a witness an accountant who, based on petitioner's testimony as he interpreted it, made a computation of petitioner's profit and loss from the operation of the tavern for the years here in issue. In this computation the accountant separated packaged sales and bar sales. On the basis of this computation, petitioner's witness arrived at a loss from the tavern *27 operation in each of the years here in issue except the year 1967, and a profit in that year of approximately $1,800. Most of the items in this computation were based on estimates and not on records. In the computation, the percentage of sales that were packaged sales was shown as 43 percent in 1965 and 1966, 39 percent in 1967, and 41 percent in 1968. There were many estimates used in these computations, the factual basis for which is not established in the record. In our view the computation of petitioner's witness is of little, if any, value. Clearly petitioner made a profit from the tavern operation for each of the years here in issue in an amount in excess of his living expenses. The record shows that petitioner paid all the bills connected with his tavern operation and paid his living expenses from receipts of the tavern during the years here in issue. The method used in respondent's computation seems totally appropriate. However, it is clear from this record that some packaged goods were sold and respondent made no adjustment for such sales, and that the price at which the beer and whiskey was sold is overstated by respondent in his computation in the amount of approximately *28 10 to 20 percent. It is apparent that the result of respondent's failure to allow for packaged goods sales in his computation is an overstatement of gross receipts. Also, the preponderance of the evidence here indicates that the spillage in the years here involved exceeded 15 percent. Since, clearly, there is overstatement in respondent's computation of the additional receipts from petitioner's tavern operation and petitioner's computation is unreliable, we have used our best judgment on the basis of all the facts in this record and concluded that petitioner had additional receipts from the tavern business of $4,000 in 1965, $5,000 in 1966, $4,500 in 1967, and $6,500 in 1968. Whether any part of an overpayment of tax is due to fraud is to be determined on the basis of all the facts of record, bearing in mind that respondent must show fraud by clear and convincing evidence. Stratton v. Commissioner,54 T.C. 255, 284 (1970). As we stated in the Stratton case, it has long been recognized that fraud is an intentional wrongdoing and that the question of intention is a factual one to be determined from consideration of the entire record. Considering the record *29 here as a whole, we conclude that respondent has failed to show that any portion of the underpayment of tax by petitioner in any of the years here involved was due to fraud. Petitioner was a man of little education. He relied on tax preparers to make out his tax returns. Although there is some confusion in the record as to exactly what petitioner turned over to the tax preparers with respect to his brokerage accounts, on the basis of the record as a whole we have found that he turned over to the tax preparers his monthly brokerage statements. We believe petitioner's statement that he thought he did not have to report the result of any sales of stocks until he took some money out of the brokerage accounts. Why the tax preparers did not inform petitioner otherwise is not shown in this record. However, we believe petitioner's statement that the tax preparers did not inform him otherwise. If we were to assume that Mr. Strauss did inform petitioner otherwise and that Mr. Strauss checked the brokerage statements furnished to him for sales of stock, we would then have to assume that Mr. Strauss knowingly signed as preparer a return that he knew was not accurate. There is nothing in *30 this record to indicate that Mr. Strauss would in fact have falsely signed petitioner's return as preparer.Unfortunately, Mr. Strauss was dead and not available to testify as to why he had not included any sales transactions in preparing petitioner's returns. The record shows that Mr. Rotolo was alive at the time of the trial but that he was approximately 82 years old and in ill health. Respondent to some extent argues for a determination of fraud here based on the fact that petitioner did not call Mr. Rotolo as a witness. However, respondent could have called Mr. Rotolo as a witness if Mr. Rotolo were able to testify, and he did not. The burden as to fraud is upon respondent and the unexplained absence of a witness must therefore weigh against respondent and not petitioner. Respondent argues that petitioner was not cooperative with the revenue agent, but the record fails to support this contention by respondent. In fact, respondent argues that petitioner lied to the revenue agent by telling the agent that he had no stock transactions. However, the testimony of the agent who was respondent's witness is clear that petitioner said to the agent what he said in his testimony *31 here, that he never took any money out of his brokerage accounts and that, in his view, he had no transaction until he took money from the accounts. On the basis of the entire record we conclude that respondent has failed to show that any part of the underpayment of tax for the years here involved was due to fraud. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
*. So reported on return. Correct addition is $20,652.74.↩